Benjamin R. Eid (No. 028148)
Eid Law, PLLC
4022 E. Greenway Road, Suite 11-134
Phoenix, Arizona 85032
(602) 935-4777
ben@eid-law.org
*Attorneys for Plaintiff*
*Mya Simons*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mya Simons, individually, as the surviving parent of Samantha L. Copeland, and as Personal Representative of the Estate of Samantha L. Copeland, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>QuikTrip Corporation, a foreign corporation; John Does I-X; Janes Does I-X; ABC Corporations I-X; and XYZ Partnerships I-X,<br><br>Defendants. | Case No. 4:22-cv-00186-SHR<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR PROTECTIVE ORDER RE: VIDEO SURVEILLANCE** |

The Court should deny Defendant QuikTrip Corporation's ("QT") Motion for Protective Order Re: Video Surveillance (Doc. 26) ("Motion") because QT cannot meet its burden to show that it will suffer any specific prejudice or harm without a protective order. The surveillance video depicts QT's front entrance door falling on Samantha Copeland, outside the store, which is the incident at issue. No harm will result from QT producing that footage because thousands of customers enter and exit the store daily and can easily observe the front doors and entrance. Plus, QT neither hides its cameras nor keeps its video surveillance a secret; in fact, QT live-streams the surveillance video on large television screens inside the store. QT has no basis to demand a protective order before producing the relevant footage, which QT publicly broadcasts and does not protect as a trade secret.

## I. Factual Background.

On April 27, 2021, Samantha Copeland, a 42-year-old woman with late-stage cancer, approached the front entrance of a QT store from the parking lot. Another customer opened the door to exit. *See generally* Complaint. Suddenly, the door fell backwards off its hinges towards Ms. Copeland and knocked her to the ground outside the store. *Id.* As a result, Ms. Copeland suffered serious injuries to her upper torso and back that required surgery. *Id.* Unfortunately, in June 2021, Ms. Copeland died during back surgery. *Id.* Plaintiff Mya Simons is Ms. Copeland's only surviving parent, statutory beneficiary, and personal representative of Ms. Copeland's estate. *Id.*

QT has video surveillance that captured the April 27, 2021 incident on camera, including the entrance door falling on Ms. Copeland outside the store. Motion at 2:20-21. QT does not conceal that it conducts video surveillance of its stores. To the contrary, presumably as a theft deterrent, QT actively displays its surveillance video on a live feed on large television screens inside the store. *See* Motion at 4:22-26.

Any customer or employee inside the store can see the cameras in operation and view the surveillance footage. *Id.* In addition, any of the thousands of customers who enter and exit the store every day can observe QT's exterior entrance and front doors. QT further allows the public to request copies of the store's video surveillance footage from QT's legal department, which includes an email for the public to request video. *See, e.g.*, protectiveservices.quiktrip.com. In short, there is nothing confidential or secret about QT's video surveillance of its store entrance, which is open and available to the public's view "24 hours per day, seven days per week." *See* Motion at Ex. A, ¶ 5 (Doc. 26-2).[1]

Further, on the day Ms. Copeland suffered her injuries, two officers from the Phoenix

---

[1] Presently, Ms. Simons has no reason to believe that video surveillance from behind QT's cash registers or interior areas of the store accessible only to QT's employees are relevant in this case. The obviously relevant issue is the front entrance door that fell on Ms. Copeland. QT's discussion about video surveillance of other areas is either designed to distract the Court's focus or was simply copied and pasted verbatim from the nearly identical motion(s) that QT filed in other case(s) without giving any thought to the specific facts of this case. *See, e.g.*, Motion at 4:18-21; *Libretti v. QuikTrip Corp.*, U.S. District Court for District of Arizona, Case No. 2:22-cv-00493-GMS (Doc. 25).

Police Department responded to the scene. The officers wore body cameras. The body camera footage depicts, among other things, the front entrance of QT's store just as any member of the public would see it upon approaching the store from the parking lot.



In addition, one of the officers met with QT's manager inside the store. QT's manager showed the officer the video surveillance footage of the glass door falling on Ms. Copeland, which included the manager rewinding, replaying, and zooming in and out on the footage. The officer's body camera captured that video surveillance footage, and QT's manager also provided the officer with a DVD copy of the video surveillance. *See* Motion at 3:18-19. Any member of the public could submit a public records request for the Phoenix Police Department's body camera footage from that day, which would necessarily include QT's video surveillance footage of the incident. In fact, QT would not even receive notice had any members of the public made such a records request or received copies of the

footage.





Despite these undisputed facts, and QT's mandatory disclosure obligation under Fed. R. Civ. P. 26(a)(1)(A)(ii), QT has repeatedly refused to produce—in any format—its video surveillance of its front entrance door falling on Ms. Copeland. During a meet and confer before QT filed the Motion, QT demanded that Ms. Simons's counsel agree to: (1) "attorneys'-eyes-only" review of the footage, and (2) a six-page protective order that was not only unnecessary but excessive and overly broad. *See* Declaration, attached as **Exhibit 1**, at ¶ 7. Now, QT apparently concedes that it made unreasonable demands during the meet and confer because QT submitted a narrower, two-page proposed order with the Motion (Doc. 26-1). But the proposed protective order that QT submitted would still unnecessarily restrict disclosure of the video surveillance to Ms. Simons, her attorneys, and her expert(s), which means that Ms. Simons could not use the video surveillance: (1) during interviews or depositions with lay witnesses (including the police officers who already viewed and received copies of the video); (2) at a mediation or settlement conference with a neutral third-party; or (3) at a jury trial. *See, e.g.*, Motion at 2:1-10 and 7:11-16; Doc. 26-1. QT's proposed protective order would also burden Ms. Simons with the obligation to separately move to file any portion of the video surveillance under seal any time she submitted it as an exhibit with a filing in this case. But QT simply has not and cannot demonstrate that any protective order is necessary.

## II. The Court Should Deny QT's Motion Because QT Cannot Meet Its Burden.

The Court should deny the Motion, which failed to even address QT's burden under Rule 26, because QT has not and cannot meet its burden.

### A. QT Failed to Establish Good Cause for a Protective Order With Specific Examples of Significant Harm.

QT has not and cannot demonstrate good cause for a protective order. "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). But to establish good cause, "the party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted." *Phillips v. General Motors*

*Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002); *accord Foltz v. State Farm Mut. Auto Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992), *quoting Cipollone v. Ligget Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986). Instead, "the party seeking a protective order must make a clear showing of a particular and specific need for the order." *Granger v. Lowe's Home Centers, LLC*, 2015 WL 1932474, *4 (E.D. Cal. 2015). "Where a business is the party seeking protection, it will have to show that disclosure would cause significant harm to its competitive and financial position" via "specific demonstrations of fact, supported where possible by affidavits and concrete examples, rather than broad, conclusory allegations of potential harm." *Deford v. Schmid Prods. Co.*, 120 F.R.D. 648, 653 (D. Md. 1987).

Here, QT makes general allegations that disclosing the surveillance video may lead to theft, security or safety concerns, or competitors learning about QT's surveillance. But QT does not keep the entrance to its store or its surveillance video secret. QT's entrance is available to the public "24 hours per day, seven days per week." *See* Motion at Ex. A, ¶ 5 (Doc. 26-2). QT also broadcasts the surveillance of its front doors on large television screens inside the store, which any customer or employee can view without permission at any time. In addition, the specific footage at issue in this case concerns the front doors, entrance to the store, and immediate exterior of the store. The areas behind QT's cash registers or "employees' only" areas of the store are not at issue, and any alleged theft or security concerns are baseless. Further, any member of the public could obtain access to the exact same surveillance footage of the front entrance door falling on Ms. Copeland through a public records request with the Phoenix Police Department, which captured that footage on body cameras. QT's broad (and improbable) assertions of potential, non-specific harm do not meet its burden under Rule 26 and relevant case law.

QT relies heavily on several unpublished decisions where courts granted protective orders related to surveillance footage, but all of those cases are distinguishable because:

(1) none involved QT; (2) none involved a retailer—like QT—that broadcasts a live-feed of the surveillance footage in-store for customers that reveals the exact location and views of the cameras; and (3) none involved the publicly observable exterior or front entrance of a store open on a 24/7 basis. *See Chicago Sun-Times v. Chicago Transit Auth.*, --- N.E.3d ---, 2021 WL 2716304, *1 ¶ 7, *2 ¶ 12, *3 ¶¶ 16-17, *9 ¶¶ 44-45, *10 ¶ 51 (Ill. App. 2021) (interpreting FOIA exemptions and finding mass transit authority met its minimal burden to reject newspaper's FOIA request for surveillance video that would disclose "**position** of the cameras" and their capabilities, which security system owner had a uniform policy not to publicly disclose to prevent crime and terrorist attacks) (emphasis added); *DeHate v. Lowe's Home Centers, LLC*, 2020 WL 7084551, *2-3 (C.D. Cal. 2020) (granting defendant a narrow protective order where "videos disclose[d] the **location** of the surveillance cameras, which is a protected trade **secret** and confidential," because "other retailers could use the information . . . to determine **where a camera is placed**" and "the public could exploit that information to commit theft," but refusing to require plaintiff to apply to file such materials under seal) (emphasis added); *Hague v. Union Pac. R.R. Co.*, 2021 WL 2383193, 3 (D. Neb. 2021) (granting protective order where security footage would reveal "the **location** and field-of-view of its camera footage.") (emphasis added); *Turner v. Sam's East, Inc.*, 2018 WL 6061085, *1-2 (E.D. Mich. 2018) (granting protective order regarding "proprietary information about where security cameras are **hidden** in their stores" to "prevent would-be burglars from determining the **secret** locations of surveillance cameras.") (emphasis added); *Ruiz-Camacho v. Costco Wholesale Corp.*, 2017 WL 1276049, *1-2 (D. Nev. 2017) (granting protective order related to confidential "**blueprints** for the **location** of video cameras" and, because that portion of the motion was unopposed, for video of the slip and fall incident) (emphasis added). None of these cases assist QT.

**B. QT's Surveillance Footage Does Not Qualify as a Trade Secret.**

QT claims its surveillance video is confidential and proprietary, and implicitly argues it constitutes a trade secret. *See, e.g.*, Motion at 8:3-6. To qualify as a trade secret, among other things, a party must undertake reasonable efforts to maintain its secrecy.

A.R.S. § 44-401(4)(b). "[T]he hallmark of a trade secret obviously is its secrecy." *Enterprise Leasing Co. v. Ehmke*, 197 Ariz. 144, 149, ¶ 15 (App. 1999). "[M]atters that are public knowledge are not safeguarded as trade secrets." *Id.* "Only those secrets affording a demonstrable competitive advantage may properly be considered a trade secret" if a company "can show that the information confers upon it an economic advantage over others in the industry." *Id.* at 150, ¶ 20. A company must "show that it exercised reasonable care to safeguard the secret." *Id.* at 150, ¶ 22. "Indeed, the most important factor in gaining trade-secret protection is demonstrating that the owner has taken such precautions as are reasonable under the circumstances to preserve the secrecy of the information." *Id.* Businesses that use "only scant precautions in guarding the confidentiality of the secret will not receive protection." *Id.* "[P]ublic revelation would dispel all secrecy." *Id.* at 150, ¶ 23. Courts may also consider the following factors in determining whether to issue a protective order regarding an alleged trade secret:

> (1) The extent to which the information is known outside his business; (2) The extent to which it is known by employees and others involved in his business; (3) The extent of measures taken by him to guard the secrecy of the information; (4) The value of the information, to him or his competitors; (5) The amount of effort or money expended by him in developing the information; [and] (6) The ease or difficulty with which the information could be properly acquired or duplicated by others.

*Deford*, 120 F.R.D. at 653, *quoting Waelde v. Merck, Sharp and Dohme*, 94 F.R.D. 27, 28-29 (E.D. Mich. 1981).

Once again, QT does not undertake any efforts protect the secrecy of the existence and location of its security cameras, particularly the camera(s) at the store's front entrance. To the contrary, QT live broadcasts the security footage in its stores and the entrance and cameras are readily observable to the thousands of customers who enter and exit the store every day. QT's broad, non-specific assertions of confidentiality and secrecy do not satisfy its burden. The Court should reject QT's argument that its surveillance video is a trade secret.

### D. QT's Private Interests Do Not Outweigh Public Concerns.

QT cannot establish good cause for a protective order regarding the surveillance video, but even if it could, QT has not demonstrated that its private interests outweigh public concerns. "If the court finds that defendants have met their burden to show particularized harm will result from disclosure of the information to the public, the court must then balance the public and private interests to decide whether protection is warranted." *Contratto v. Ethicon, Inc.*, 227 F.R.D. 304, 308 (N.D. Cal. 2005), *citing Phillips*, 307 F.3d at 1211. Relevant factors to balance include:

> 1) whether disclosure will violate any privacy interests;
> 2) whether the information is being sought for a legitimate purpose or for an improper purpose;
> 3) whether disclosure of the information will cause a party embarrassment;
> 4) whether confidentiality is being sought over information important to public health and safety;
> 5) whether the sharing of information among litigants will promote fairness and efficiency;
> 6) whether a party benefitting from the order of confidentiality is a public entity or official; and
> 7) whether the case involves issues important to the public.

*Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 483 (3d Cir. 1995).

Here, QT's proposed protective order would require Ms. Simons to move to file under seal any portion of the surveillance video relevant to any filing in this case. But the public has a general right to inspect and copy public records and documents, including judicial records. *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006), *quoting Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). Courts have a strong presumption in favor of public access. *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995). Unsupported hypothesis or conjecture will not overcome that presumption. *Id.*, *quoting Valley Broadcasting Co. v. U.S. Dist. Ct.*, 798 F.2d 1289, 1293 (9th Cir. 1986). Instead, a party seeking to seal judicial records must overcome the strong presumption of public access with compelling reasons supported by specific facts. *Kamakana*, 447 F.3d at 1178. "The mere fact that the production of records may lead to a litigant's embarrassment,

incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.* at 1179. Compelling reasons to seal documents may include libelous statements or business information that would harm a litigant's competitive standing. *Center for Auto Safety v. Chrysler Group, LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016), *quoting Nixon*, 435 U.S. at 598-99.

As set forth above, QT does not protect its surveillance video or store entrance as a trade secret, but already makes its entrance and surveillance video available to the public, including on large television screens in its store. Producing the surveillance footage of the glass door falling on Ms. Copeland will not violate any privacy interests, and Ms. Simons' interest in the footage is for legitimate purposes for this case to show how QT's failure to maintain its store caused the incident. QT may be embarrassed by the footage, but QT's desire to hide from the public that it fails to safely operate and maintain its stores does not justify entry of a protective order. Indeed, the public has health and safety interests in knowing that entering QT's stores may be dangerous (and fatal) due to the lack of appropriate maintenance and other safeguards. These factors all weigh against issuing a protective order in this case, or requiring Ms. Simons to file publicly available information under seal.

### III. CONCLUSION

QT failed to meet its burden to demonstrate that specific prejudice or harm will result absent a protective order. QT's video surveillance of its store's front entrance is not a secret. QT broadcasts its surveillance footage in its store, and the front entrance is accessible to the public "24 hours per day, seven days per week." *See* Motion at Ex. A, ¶ 5 (Doc. 26-2). The same surveillance footage is also publicly available through a records request for the Phoenix Police Department's body camera footage. For these and the foregoing reasons, the Court should deny the Motion.

DATED this 26th day of August, 2022.

| | |
|---|---|
| | By  /s/ Benjamin R. Eid<br>Benjamin R. Eid<br>Eid Law, PLLC<br>4022 E. Greenway Road, Suite 11-134<br>Phoenix, Arizona 85032<br>*Attorneys for Plaintiff*<br>*Mya Simons* |